Mark Hinden, H-I-N-D-I-N, appearing for Blanca Harris and her two minor children. OPERATOR Mr. Clerk, this is a 20-minute argument. MR. CLERK Good morning, Your Honors. David Dennis representing Mr. Cortez. MR. CORTEZ There are two of us in the same position. I don't think we have to repeat ourselves. I will go forward, reserve some time for questions, and then Mr. Dennis will follow through with any points he would like to make. MR. CORTEZ I believe our reprieve brief specifically deals with issues that were brought up by the reprieve brief of the insurance company or their opening brief. I don't want to have to repeat everything, but I do believe there's a few issues that I would like to assert. One is that I don't believe there is any change between excessive or primary insurance by Berrera and also by United States. MR. CORTEZ If you read Berrera, Berrera seems to focus heavily on – well, there's two parts to Berrera, really – the quasi-public nature of automobile liability, or insurance in general, the insurance industry in general, and the financial responsibility law. MR. CORTEZ Yes. MR. CORTEZ We're dealing with an excess policy, as I understand it. MR. CORTEZ That is correct. MR. CORTEZ So how does the concept of excess insurance interact with other concerns that were at issue in Berrera? MR. CORTEZ It is understood that excess insurance allows the insurance company to have further exemptions or exercise certain issues that could limit their insurance if something comes out. But the problem is that Berrera set up a situation for all insurance to see if insurability is there. There was none done in this situation at the case at hand. Berrera never limits this only to direct, and nor did the case that came after, United Services, limit anything. So you could try to take the interpretation that there is some limitation, but there's no language in Berrera. It basically dealt with direct because that was what the case – the facts of that case were. And so we don't believe that there's any reason to limit it only to direct insurance, even though that's what the case was. We believe that, in fact, they had no plan or philosophy in place. They relied upon what budget did, which was a rent-a-car company. They have two statutes, 406 and 408. I'm sorry, 604 and 608. In that situation, the rent-a-car has to request, could I see the license, verify the picture, verify the person, and they will rent the car. But that is not the standard that we believe an insurance company should have. In case that – in this situation, that was done at the same time that Mr. Burke was there. His sister was right with him, Desiree Brewer, who was also named as a co-insurer, and he – insured, I'm sure. She was valid, licensed. In the trial court, the court made a determination that, in fact, because there was a misrepresentation, that basically Brewer would not apply nor anything else. In fact, Brewer says, even if it is misrepresentation, it doesn't matter. The duty is on the insurance company to do their due diligence to see if there's a misrepresentation, and if there is a misrepresentation, it's a misrepresentation of their insurability. We believe that's important. In this situation, is the budget the agent for Philadelphia? I believe the relationship was that they had throughout at least California, if not other parts of the United States, budget would sell Philadelphia's insurance. And all they would do is ask if they wanted excess insurance at the time of the rental of the car. If they say yes, a box was checked, a fee was paid, and Philadelphia would in fact go ahead and issue the policy. That's all there is. Now, there was no communication from budget to Philadelphia, look, we've insured these people today. Here are their copies of their licenses. Check if you want. Well, that's the issue. Well, factually, that wasn't done, probably. Is that right? I don't think anything was done other than the fact that the insurance was paid. Because what looks like happens is that until there is a claim, until there is a third And Barrera is basically stating that's not fair, that the insurance company is a quasi-governmental agency, and there is a duty to the world outside that if somebody buys insurance, there should be the belief that that insurance is in place. Because of the short period of time, which I believe is an issue here, we had four days in this situation. And Barrera was a year and a half, and United Services, it was 35 days before the problem of the misrepresentation came up. Could I pursue that question of time? Because we're more or less guessing what the Supreme Court of California would do on excess liability. And if you impose a duty to investigate before giving the excess insurance or keeping it on the fact, how much time is it going to take to get rental insurance when you go up to the desk and are they supposed to get to it? Is there some database they could get to right away that would tell you? Yes, hours. Within hours, you could verify. Hours is not good enough. People want their car within minutes. The commerciality of the business is I want a car, I want it now, I need to leave, I have a plane to catch or I have to have a meeting. Understood. But that doesn't mean that once the insurance, which they were doing anyhow without any investigation, that fact is that within a day or so or hours, that somebody who was hired to do this at a very low cost goes ahead, gets into this bank, because in fact the investigating The man is driven off with a car. What does the insurer do? Then they get a hold of the insurer by some phone or some address and indicate, probably by telephone, some way to connect them and say that we have a problem with your insurance, your excess of insurance is denied. Is somebody driving from San Diego to San Francisco, stopping at motels on the way, how do they reach him? That maybe there is maybe a disclosure that could be made at the time. I'm now jumping ahead and assuming these things. I'm trying to guess what the Supreme Court of California would do. I think they'd be interested in the mechanics of how this would be handled. Well, the point being is that if a reasonable search was made, we believe that type of search could be done within hours, because the investigating officer at the time of the accident, within hours of the accident, realized that Burke's license was in fact invalid from the State of Arizona, which means that there is in this day and age of computerization, getting that information is not difficult to do. So whether or not the policy goes into effect and then rescinded thereafter in a reasonable period of time, the question is what is the duty of the insurance company and also, because we live in a commercial world, what duty is fair to insert upon the insurance company? And if, in fact, the insurance company could do a check at a reasonable cost within hours or days, does that mean that they're alleviated from any responsibility? Well, the time it will take to do the check and then there's the problem of communicating the rescission, because they have to communicate it to the applicant, don't they? It's not effective unless they reach the driver. If you're asking me how I would handle it is that you would request the person that is renting the car, buying the excessive insurance and saying, where is an address that we could contact you within the next 48 hours, whether it's his home or somewhere else, and they'll have the responsibility. But the issue is the insurance company must have a duty to do some investigation. The question is how they rescind if, in fact, they realize that there is a misrepresentation can be addressed. But because there may be an impossibility or a problem with contacting the person doesn't vitiate their responsibility to do due diligence. Do you think this is a question that should be certified in the California Supreme Court? I think it's that important, yes. You didn't address that in your brief. I did not. I have nothing else unless there's other questions. And, Mr. Dennis, may I? You can answer that. Thank you. Your Honors, I'm going to briefly touch upon the issues that this court was concerned with. In reality, the facts were that the police were able, within minutes, to ascertain whether or not that license was suspended or not. They basically have access to a database. They punch in the driver's license. It comes back whether it's valid or not. So do the insurance companies have that same accessibility? Well, they should have that in place if they're going to deny coverage. Basically, they have a duty to investigate reasonably. Do they have the same access that the police have? I don't know. It's not in the record. No, it's not in the record. But it is something that is available to you. I mean, it's a specific database that they have to subscribe to or get. And in this age of Internet and information. Well, the district court didn't address these factual issues, assuming that there is a duty to investigate. Right. They didn't even go. They basically stopped at saying that excess coverage was not covered by Barrera, and that's not correct. Basically, Barrera's policy extended to all insurers, all insurers. And that's specifically addressed in our reply brief. And that duty to investigate goes to the primary financial responsibility, goes to the excess insurance. It's all insurance. You see no difference. There is no difference. You see no difference between excess and primary. No. Basically, you just have an amount of insurance. And if a major accident happened and you have more insurance, you have the same duties and responsibilities. It doesn't differ. There's only a different dollar amount. Responsibility laws, you only have to carry a certain amount of insurance. Correct. You're not required to carry excess. No, you're not. But in this particular – well, let's say you do have a major car accident that goes over $30,000 in damage. And, I mean, basically, that's true. The responsibility of the insurance – there's still the duty on the insurance company to do their – to investigate the insurability of their insurer. And you're right. At that case, if that's all they purchased, they'd be only responsible for $30,000. But in that particular case, excess coverage was purchased, so you have a large amount. I gather Mr. Burke had his own primary policy? No. Budget is self-insured, and they basically insure the first $30,000. And they have an excess policy, which this person purchased, paid the premium and everything, and that insurer under Barrera and under Pagos, which is basically reaffirming it in 2003, that basically that insurer is not – the responsibility is still on that insurer to investigate. It's not obviated or alleviated. So they did not do that, and that's why the district court actually – they just stopped at saying that excess policies are not covered under Barrera, and that's completely untrue. And it's within our reply brief and address there. And I did indicate the court also asked if Budget was an agent. And if they were an agent, they – if they were the agent as an insurer, they still have that duty to investigate, and they didn't do that. They simply fulfilled their duty to rent the car, but they did not fulfill their duty to insure. And that's the difference here. If they are – Well, they have to be the agent. They have to be some agent. Yeah. So if there's an agency, they're still – it doesn't alleviate their duty to investigate the insurability. I know. Correct. I asked the question because it imposes a duty. Yes. And it would. And in this case, either Budget would or somebody from Philadelphia under – considered called underwriting or something. And we have to understand the exposure here, because these are car rental companies. They are transacting insurance on a daily basis. And if this were to remain the law where excess policy isn't going to cover, people who are severely injured are going to be without coverage, without remedy. And in this case, the insurance companies have a remedy. If they've been misrepresented by their insurer, they can go after their insurer. The victims shouldn't be the innocent third parties out there. There is an understanding that there's insurance and there's financial responsibility laws in place that drivers are supposed to be insured. And if they're not insured, I mean, basically, then we'd be defeating the financial responsibility laws that are in place. Thank you. And I'll reserve the remaining time. Okay. Thank you. May it please the Court, I'm Jim Green, and I represent the Philadelphia Indemnity Insurance Company, the APALE in this case. I think the issues have become pretty well focused by the argument so far. I think what is clear that this is a case of a car rental transaction as opposed to a consumer auto insurance transaction which was being dealt with in Barrera, which are two quite different animals. This is a very lucrative business for Philadelphia, I assume. Well, Your Honor, certainly there are premiums paid. This is short-term insurance. That's right, and they get about, what, $10 or $11 a day for a day's insurance. Multiply that by $365 and you have a pretty high premium, don't you? Well, certainly, Your Honor, but no one would buy that type of insurance on an annual basis. If they wanted to have their own annual insurance, they would buy it and get it at a much lower rate. I understand that, but this I'm just making the point is that it is a very lucrative business, and it's a business where, as Judge Noonan suggested, you come in, you pick up your car, and you're off, and you don't want to wait around for a half an hour, an hour, two hours while they check out whether your license is still valid. That's correct, Your Honor. These transactions occur much more rapidly because the commercial reality is that's what the public wants, that's the nature of that type of transaction. And that's what the insurance company wants, too. I go in, and they always say, well, now you want to take the coverage, don't you? And I say, no, I'm very heavily insured already, and the government has insurance for me, too. And they say, oh, but you probably want this. And I have to say about twice or three times, no. Well, and Your Honor, certainly. You've all had that experience. Right. That's absolutely correct. And those of us that carry our own excess insurance, perhaps that's, you know, certainly we can say we're already adequately insured. Others may feel that they need additional insurance. The rates that are charged are those rates that are approved by the various insurance departments in the states because of the nature of the insurance. The point I'm trying to make is that I think that the insurance company has to accept some risk in this situation. They have decided, okay, because of the nature of the transaction, I'm not going to investigate beyond seeing that it looks like a facially valid license. So what should the consequences of that be? Well, Your Honor, it's not just that the insurance companies have made that determination. If you think about the commercial context, and that's the big distinction here between what we're talking about It's the kind of thing where this insurance can only be offered through the context of a car rental. The primary transaction is the rental of the car. There is insurance that's incidental to it. There's optional insurance. It's not required, this product is not required to rent the car, but it's incidental to the transaction. There's no one from Philadelphia Indemnity, no insurance company employee that's sitting at the rental counter and you rent your car, and then you move over to the next counter, you know, and determine whether you want insurance. As we all know from having done these transactions, the rental company hounds this through their rental counter clerk as all one transaction. And the legislature of the state of California has seen fit to deal with this. And let's think, first of all, for this type of insurance, this excess insurance, the only qualification that the person has to have in order to opt to take this insurance is to be qualified by the rental car company to rent the car. And what that entails is the rental car company determining whether they have a valid driver's license. That's what qualifies that person to rent a car, because we all know, you know, you have to have a driver's license to drive a car. The only exceptions being certainly that if you have a blind or disabled person, they can have somebody come with them to do the driving and they actually rent the car. But otherwise, in order to rent a car, we have to have a valid driver's license. The state of California, so in that respect, in terms of qualifying both to enter into the rental contract and to be able to take the optional excess insurance, the qualification is being handled by the rental counter company, their counter representative, and they're wearing a dual hat there. That one hat is for the rental car company and one hat is qualifying them to be offered this excess insurance. And if they make a mistake because they accept as valid a license that isn't, who should bear the risk of that? To the extent that they are violating any law, certainly in qualifying someone for the excess insurance, then they are acting on behalf of Philadelphia and Philadelphia is bound by what they do to that extent. But, Your Honor, I think the key point is that the state of California for a long time has had statutes on the books that govern exactly this transaction and what the rental car companies are required to do to qualify a driver to enter into that rental contract. And the statutes say very clearly, first of all, and this is in Section 14608, that the rental car company representative is required to look at the driver's license and then they want to verify that the dates are valid, that sort of thing. And then when they have the person sign the rental agreement, they can compare the signatures. Section 14604, which is a companion statute, specifically says there is no duty to go and check DMV records. Well, shall we ask the Supreme Court about this? You know, I really don't think that the Barrera case is even close enough to this situation for there to be that close a question as to whether or not it would apply here. And, you know, I think that it's so important in looking at Barrera, you look at the you look at what that case is based on, and Your Honor's hit on that in the argument of my able opponents, and they, in fact, hit on it over and over and over. And it's stated over and over and over in Barrera that it is based on and emanating from the public policy of financial responsibility law in California. That is that 15,000 per person, 30,000 per accident coverage, minimum coverage that all of us have to have if we drive a vehicle in California on the road. But there's no requirement under that code, under the financial responsibility law, for anyone to have excess insurance. So if you look then at the further public policy analysis in Barrera, what the court was doing there is saying, look, the FR, financial responsibility law, creates a duty to the public because that statutorily required insurance is not only for the benefit of the insured, but the rest of the traveling members of the public to protect everyone on the road. And we don't have any case squarely on from California, do we? There's not a case that's squarely on point. No, Your Honor. That's why we asked the California Supreme Court to tell us what it should be. Sometimes I think that's appropriate. Others, when, even though there's not a case directly on point, it's readily apparent from the two different situations that it doesn't apply. I mean, each of the cases that have, and the cases, in fact, that my opponents have cited in their brief, American Continental Insurance versus C&Z Timber, for example, very pointedly said that that particular case, Barrera, was grounded in the public policy of financial responsibility law of California. And every other case that they cited said the same thing. And no case in California has ever applied this to a policy above that. And I think the key thing. I'm not sure whether they have, you know, gone to the appellate level, but I think the really key thing in Barrera that just puts the icing on the cake, in the Barrera decision, and, of course, that's at 71 Cal Second 659, at, excuse me for a minute, I'm sorry, at page 681 of that decision, the court there is discussing, in general, the implications of this rule that they're, that they were adopting. And they said, okay, what would the remedy be for someone who has successfully, successfully brings the defense of estoppel and gets a ruling that the insurance company is a stop to deny that there's coverage. And at page 681, the court said, after the injured person has obtained a judgment against the insured, therefore, he may compel the insurer to pay the judgment to the extent of the monetary limits set forth in the financial responsibility law. Well, it's focused on that. But, you know, Barrera's 35 years out of date. And as your appellate's pointed out, it's a lot easier now to get almost instant information. And it at least seemed to me that if this went before the Supreme Court of California, they'd like to know how much of a problem it was to find out if the license was valid. Well, Your Honor, you Do you think they'd want to know that? Perhaps, Your Honor. But you know that in 1993, which in this day and age is not that long ago, section 14608 that deals with exactly what we're talking about, what the rental car company is required to do to qualify a renter in terms of examination of driver's license was amended. And, of course, Barrera had been on the books for a long time. And Part of the connection with the rental business of the renting of the car. That's true. But certainly it is exactly the same concept. And everybody is aware. You have a different view when you look at it in the context of insurance. Either way, the point that Judge Noonan made in a previous argument, I think, is quite valid. You're talking about a transaction that occurs and sometimes is fully performed in one day. You fly in. You rent a car. You go do your business. You come back in the afternoon. You turn the car in. You get on the plane and you fly home. We're talking soup to nuts full performance of the contract in one day. And the type of thing they're talking about is being able to go and find out in several days. Just because the police department can get information, we all know doesn't mean that each of us as private citizens or private businesses can get that same information. Each company could get that. There are ways that they can get it in California, although the privacy considerations are a real problem. But that doesn't mean that they can get it in every state. Not every state has their DMV records computerized on a database that can be made available to businesses. As a matter of fact, very few of the states do. So here we've got an Arizona driver's license. What if it was from Nevada? What if it was from Utah? The fact of the matter is that for a lot of things that we do in life, we have to rely upon people being honest in transactions. And the overwhelming majority of people that walk up to rental counters are honest when they hand their driver's license  Occasionally it happens, as it happened in this particular instance. Well, Mr. Burke, I think in his deposition claimed he didn't know that his license had been suspended. That's correct, Judge Paez. He claimed that. However, the evidence was overwhelming that he did know, based on the fact that he'd had repeated suspensions in the past. He knew that if he didn't attend his court appearances that were required, that the inevitable result would be suspension of his license. It happened repeatedly, and it happened in this instance. And Judge Lew, I think, quite correctly made the factual finding after hearing all the evidence that he knew that that driver's license was invalid when he handed it to rent that car. Or if he didn't know it for sure, he had no reasonable basis, based on his long experience of suspended driver's licenses, to be able to make the representation that was valid in light of the fact that he had just over a number of months period been missing repeated court dates on a suspension issue. So, yes, that was a situation where he testified he didn't know. The fact of the matter is, I think the evidence proved otherwise, and Judge Lew so ruled. And so we've got a situation that is not the everyday thing that occurs. Matter of fact, it's pretty rare. I have the pleasure of representing rental car companies and their insurers all across the country, and I've done so since the early 80s. Sure, I've seen a couple of cases around the country where there have been people present false driver's licenses, but you'd be surprised that it doesn't happen as often as you would think. And so we're not talking about something that happens repeatedly day after day. This is a situation where, you know, they keep saying that we sought rescission. We didn't. There was an exclusion. There wasn't a policy rescission involved. This is a situation where we have somebody that just basically took advantage of the system and came in and intentionally, you know, rented a car based on a driver's license that he knew wasn't valid, and he knew he had no right to be driving. And the statutes that govern under California law what the rental car company is required to do, and that rental car company is the only one that's handling this transaction, is hand in glove with qualification of the person to both rent the car and have this insurance, and they did exactly what they had to do. To follow up on Richard's earlier question, what's the relationship between budget and Philadelphia? In this particular instance, the insurance policy is a master policy under which budget is the owner of the policy but not an insured. Budget has the right to enroll renters that opt to take this voluntary coverage at the rental counter in the course of a rental transaction, but they can only enroll renters on that policy as insured if that renter qualifies to be a renter and enter into the rental contract. So the qualification as a renter and the ability to enroll them is the same act, the same scrutiny that the rental car company goes through when you present your driver's license at the rental counter. It's the same act. And to that extent, they are acting as a very limited agent for Philadelphia in that context, no question. It's not a broad agency, but it's a very limited agency. Enroll them under the master policy. Yes, sir. Yes, Your Honor. Let me ask a question which really doesn't relate to the merits of this case. We had a case earlier in the week between budget, the national company, and SoCal, which is the budget company for Southern California. As I understand it, SoCal is supposed to have an exclusive right to sell in this area, and yet budget, the national, is out there at LAX selling or renting cars. Do you know what that situation is? Your Honor, I don't represent budget and I sure don't know. That's very odd. That's the first I've heard of that. As I said, I don't represent budget. I represent several other rental car companies, but I don't represent budget. So I'm sorry. I don't know the answer to that question. I'm not sure that we've got the right parties hanging around here. It sounds like a real interesting lawsuit. It's just one that I don't happen to be in at this time. You know, there's one other thing that I think that's discussed in Barrera and I think brings into focus why we can see that Barrera simply doesn't apply to this situation. And that is, I'm sure you all will, from reading the case, will recall that there was a mention of the reasonable expectations doctrine in that case. And what they were talking about there was because of the fact that the financial responsibility limits, mandatory or compulsory limits, are deemed to be insurance that's both for the benefit of the insured and the public, that the public then has a reasonable expectation that each of the other drivers on the roadway will have at least, you know, that minimum compulsory insurance when they drive a vehicle. Well, in this particular case, on this particular appeal, all of the appellants in the other vehicles were in the other vehicles that were involved in the accident, not in the rental car. None of them were part of the rental car transaction. They fall into that category that the financial responsibility law creates as third parties who have reasonable expectations that others will comply with the financial responsibility compulsory insurance laws. And so their reasonable expectation of these appellants is limited to the financial responsibility laws because we know that there's no more than that minimum level of insurance in order to operate a vehicle. So they have no reasonable expectation that the driver of this rental vehicle would have had excess insurance above the minimum compulsory insurance levels. And they concede those minimum compulsory insurance levels were available and are there through budget, and that's not even an issue in this case. For all those reasons, I believe respectfully that the court should affirm the trial court. And if there's any further questions, I'd be happy to address them. I don't believe so. Thank you. Thank you very much. Just briefly. Thank you. In this situation, life is an evaluation of risk. Everything we do from the time we're a child to the time we die is an evaluation of risk. Here an insurance company delegated their duties to budget. He indicated a limited agency. I'm not sure what that means. But they were in business together. Budget was allowed to issue insurance for Philadelphia. They chose to take whatever steps they needed to do, excuse me, because of a rental company. Barrera is clear. The duty is different. They put nothing in place. No explanation, no statement in the rental agreement, anything to say if you're not telling us the truth, the excessive insurance will not apply. In this situation, he's trying to indicate that this was an unsafe driver. The point you have a driver's license is the expectation that the person is a safe driver. Burke lost his license because he didn't appear at a court proceeding because he didn't show proof of insurance when his license was issued. That doesn't mean he was a bad driver. You have an administrative reason he lost his license. So, therefore, he didn't have a license, understood. The people with him had the license. There was no intent to defraud here because Desiree Brewer, in testimony, indicated that she could have gotten the license. She was an added insurer. I basically believe that the risk should be with the insurance company. They never even refunded the premium in this case. They kept it. Yet, they will not insure. I don't believe that's appropriate. Brewer is clear that the insurance company has a duty. Thank you. Thank you. The matter will be deemed submitted. Thank you. Your Honor, I did have a little bit more time in mind. You did have a minute or two. A minute left. The issue that I did want to raise was the policies are made by Philadelphia. So whatever policy they want their agent to comply with or a procedure they want them to follow, they control that. So they can't plead later on if they choose not to investigate that they're somehow victimized in this situation. They choose the policy. They choose the procedure in which they want their agents to follow. That's one. The court did get the issue of the renting versus the insuring, which was good. And basically, again, you know, the Brewer was never limited on what particular insurance. We addressed that. And I think we got it. You got it. Thank you. Thank you. Thank you, Mr. Hinton. Thank you. Thank you, counsel. The matter is submitted. The next case and our final case for this morning is Alameda.
judges: B. Fletcher, Noonan, Paez